Judge Marshall

delivered the Opinion of the Court.
This case was formerly before this Court, when the judgment rendered against the plaintiff, on the demise of Rachel Shackleford, was reversed. Reference is made to the opinion then delivered (5 Dana, 232,) for a statement of the general facts on which the controversy depends, and of the principles then decided. On the trial which was had after (he return of the cause to the Circuit Court, a verdict and judgment were rendered against the defendants, and the cause is brought here now upon their appeal.
Two of the questions made in this case, partaking somewhat-of a formal character, will be considered before we proceed to notice other points more intimately connected with the merits of the controversy.
I. It is contended that, admitting the evidence to have authorized or required a verdict against each of the defendants, it did not authorize a joint veidict against them all, because it clearly appeared that each claimed and defended for a separate and distinct portion of the land described in the declaration, and that they neither had *453 any joint possession, nor were guilty of any joint trespass. And it is said that this ease is distinguished from the general mass of the cases in which several defendants occupying distinct parcels of land, are sued in one action of ejectment, by the manner in which the defendants in this case have appeared and pleaded. The record states that “on motion of Benjamin Smith, John Moran, James Hagan, &c. the tenants in possession, they are admitted as defendants in this suit, in the room of Richard Roe; and thereupon, by their aborney, they severally enter into the common rule, confess the lease, entry and ouster in the declaration supposed, and agree to insist on the title only at the trial, and severally come and defend the force and injury when &c. and say they are not guilty, in manner and form as the plaintiff against them hath declared, and of this they put themselves upon the country.” . „
In the case of Abney vs Barnet, 1 Marsh, 107, where it is decided that aller having jointly entered into the common rule and pleaded jointly the defendants could not avail- themselves of their being tenants in severalty of distinct portions of the land in dispute—it is intimated that, “at a proper stage of the case, they might perhaps in strict propriety have required the plaintiff to proceed separately against each of t em.” But, conceding that this might be done on application in proper time, we do not admit that the entry in this case, showing a merely l'ounal severance by the defendants, is sufficient, either to require, or of itself to indicate as proper, a separate proceeding against each. Although the opinion quoted refers to the joint plea &c. as of itself decisive, by precluding the defendants from the right to avail themselves afterwards of the circumstance of their not being in fact, connected in the tenancy or in the trespass, it refers to an application in proper time, and not merely to the form of the plea, as being essential to secure a separate proceeding. And here there was not only no application for a separate proceeding, but none even for a separate finding; nor does it appear that the supposed right of the defendants was in any manner insisted on, or even suggested, in the Circuit Court. In the case of Abney vs *454 Barnet (supra,) the point was made by way of motion to instruct the Jury; and if. as then decided, it was then too late, when the defendants had pleaded jointly, we are satisfied that it is too late in this case, after verdict and appeal, although the form of entering into the common rule, and, of the.plea, may not in this case be strictly joint.
Tenants jointly sued, but holding in severalty, may it seems, require a separate proceeding against each;but it sho’d be done by entering into the consent rule, to confess for the distinct parcels in the possession of each.
The practice of suing several tenants in the same action of eject, prevails in this country, & where the questions are the same, is clearly proper; & tho’ they may sever and defend, each for his separate tenement, it is not necessary (as it was in England) to deliver to each a new declaration.
*454 If, as we need not deny, tenants holding in severalty may, when sued in one action of ejectment, require a separate proceeding against each, it can only be upon showing the fact which would render such a mode of proceeding proper. And this, as it seems to us should be done by entering into the consent rule,, to confess for the. distinct tenements or parcels in possession of each,, or for which all mean to defend. Upon this being.done, it seems to have been the ancient practice for the plaintiff to deliver to each defendant, a several declaration, that each might make his defence, and relieve himself from costs if he could. 7 Term Rep. 331.; 2 Keb. 524, 531. It was said by the Court, in Goodright, on dem. Balch vs Rich &c. 7 Term. Rep. 327, that the consent rule would show for what, each defends. But neither the entry into the consent rule; nor the plea in this case, shows, either for what parcels of the land each defendant means to defend, or that each means to defend for any distinct portion less than the .whole. Each confesses, the lease, entry and ouster supposed, which is of the whole land. And each, says he is not guilty as charged, which is as to the whole or any part of the land. And it is not until,the trial,.that It appears whether they are joint or several tenants, or what part of the land is claimed or defended by either.
The practice of suing several ten nts in the same action of ejectment, is generally prevalent in this country,, and' where the questions are substantially the same, the opposite practice would be oppressive, and has been.discountenanced. The practice of delivering a new declaration after the defendant has.been admitted, has fallen into disuse here, and'that might.not be the mode of' separate proceeding which should now be adopted'where the defendants make á timely application for that purpose. The Courts doubtless possess the power of so moulding, *455 the proceeding in this respect, as to secure the ends of justice in such cases, in the least burthen some manner. But this end would not be promoted by permitting defendants, after they had gone three times into a joint trial, and had passed through a tedious litigation without asking for a separate proceeding, to set aside a verdict against them, on the ground that it appeared on the trial, that they held in severalty separate parcels of the plaintiffs land. And it seems to us, that, if such a fact ought not, as matter of evidence, or as a ground of variance, to prevent a joint verdict against all, on a joint confession and plea, it should not have that effect on the confession and plea in this case. The difference is in form only, and not in substance. The jury are at liberty, in either case, and in the one as much as in the other, to find separately as to each defendant. And we do not perceive, why the consequences which may follow from a joint verdict and judgment, should prevent such verdict and judgment in the one case, more than in the other.
To obtain the common order in eject. it must be shown, that decleration has been served upon the tenant in possession, which mat be shown by the officer's return, or other ex parte proof. And a possession by the deft. (or a tenant for whom he is expressly permitted to defend,) must be proved on the trial, to save the plaintiff from a nonsuit. But it may be sufficient itseems, to prove that the deft. was in possession at the time of the trial; and held that, where the deft, was in possession of some of the land for which the action was brought, before it was commenced, afterwards, and at the time of the trial, but had let the land, and had no possession, when the declaration was served, but that of his tenants; none of whom were ever served with any declaration and notice; that the declaration, identifying the land, was served on the defendant, and returned as executed on the defendant in possession; and that he appeared, entered into the consent rule and defended—the proof was sufficient to justify a verdict and judgment for plaintiff.
II. It is further objected to this judgment, that, as there was evidence conducing to show that two of the defendants, Smith and Hagan, were not themselves in possession of the land, or any part of it, when the declaration was served on them, but that their tenants, upon whom the declaration was not served, were in possession at that .time, the Court erred in not instructing the jury, as moved by these defendants, that, if they were not in possession when served with the declaration, they should find for them, and in instructing the jury, on motion of the plaintiff, that if, in addition to other facts mentioned as necessary to her right of recovery, they should find that these defendants or their tenants were in possession at the time of the service of the declaration, they should find for her, as to them. It should be stated that both Smith and Hagan were in the actual possession of portions of the land sued for, before the declaration was served on *456 them, and that within a year or two afterwards, their tenants having quit, each resumed the possession. The Sheriff in his return of service, upon the declaration, stated each to be a tenant in possession, and each, as has been already shown, was admitted as a defendant as tenant in possession; entered into the common rule as such, and pleaded not guilty. And the question is whether these defendants were entitled to a verdict and judgment, on the sole ground that their tenants, and not themselves, were, at the commencement of the suit, actually in possession of the tenements claimed by them respectively, and that the declaration was not served upon the tenants?
In the case of Balch vs Rich, 7 Term Rep. 327, the plaintiff having proved title to the premises sued for, the defendant proved that he was not, and never had been-, in possession of the premises or any part thereof, and the question was reserved, whether after the defendant had entered into the conditional rules, such evidence was admissible? If admissible, a nonsuit was to be entered, and if not admissible, the verdict for the plaintiff was to stand. The reservation of such a question shows that the practice was at that time unsettled in England. And Lord Kenyon, in delivering his opinion upon it, after argument in the King’s Bench, said it had been vexata questio; that believing the doctrine laid down in Buller's Nisi Prius, 110, (Jesse vs Barbee,) to be correct, he had ruled, in a case which had come before him on the home ’circuit that, if one defendant be sued as tenant in possession, the plaintiff need not prove him in possession. But upon consideration, he was surprised that any question could be made upon it. And upon the ground that the action is a contest for the possession, which it could not properly be if one of the parties were not in possession, and upon the further ground that, from the uncertainty of the description in the declaration, the person on whom .it was served might suppose himself called onto defend the lands in his possession, when it might turn out on the trial, that the plaintiff would show title to other lands answering the description in the declaration, but of which the defendant never was possessed — in which case, he ought not to be subjected to costs — he, with the concurrence *457 of the other three judges, decided that the evidence was admissible, and in effect, that the plaintiff was bound to prove the defendant in possession. But it is not decided in the case of Balch vs Rich, nor in any other that we have seen, that if the person claiming title to land in possession of his tenants, is served with a declaration specially describing the premises claimed, it will hot be sufficient to prove that he is in possession at the time of the trial, or that he has been in possession since the service of the declaration on him.
In such a case, neither of the grounds on which the proof of possession by the defendant, was deemed necessary by Lord Kenyon, would be applicable. The person served with such a declaration is enabled to know whether he is in possession of any part of the land sued for; if he is not in possession, actually or potentially, he is under no necessity of making himself a defendant. And if, knowing the land for which the plaintiff sues, he comes in and enters into the consent rule, and pleads, and especially if he does so as tenant in possession "expressly, does he not thereby admit that he is in possession, or can control the possession of some part of the premises? And if he does, would it be as great a hardship to subject him to the costs, though he should not in fact have any such possession, as to subject the plaintiff to the costs, after the defendant, by admitting his possession, has put him to the trouble and expense of proving his title against him? Surely such a defendant would have no right to resist a judgment, so far as the mere costs and nominal damages are concerned, on the ground of hardship. And if, on the ground of incongruity, a judgment affecting the possession ought not to be rendered in this possessory action, against a party who never had the possession, this objection would seem to be entirely removed, if in addition to the Sheriff’s return that he is the tenant in .possession, and the admission of the fact implied by his confession and plea, it is proved that he is actually in possession, claiming right, at the time of the trial, or that he has been so possessed since the service of the declaration on him. In either case, he would be bound by the judgment, and whether the possession m&f *458 have remained with him until the trial, or have been transfered by his act after the service of the declaration, the possession also would be bound by the judgment. It may be added that, however the interest or convenience of the tenant actually in possession at the commencement of the suit, might be hazarded by rendering a judgment of eviction against his landlord, who had come in upon service and defended, all objection on the ground of this hazard would be entirely obviated by the fact that before the rendition of the judgment, the tenant’s term had expired, and the landlord had resumed the possession. This Court has decided in several cases where the person sued as tenant in possession has been made defendant in the room of the casual ejector, and one to trial on the general issue, that the plaintiff should be non-suited if he fail to prove that the defendant is in possession. But we do not find, and have not been refered to any case in this Court, in which it has been decided that he must, in such cases, prove the defendant to have been in possession at the time the declaration was served. It Is true that, in all cases, the proof of service of the declaration, which is the first thing done in Court, must show that it was served on the tenant in possession, and if it do not, there is no cause properly in Court. But this proof is initiatory and ex parte, and may be presumed to exist in every case which goes on to trial, as it does in this. And this is not the proof of possession required to prevent a nonsuit.
In the case of Pope vs Pendergast, 1 Marsh. 122, the Court, in affirming a nonsuit for want of proof of possession, say—“the doctrine is well settled that, to entitle the plaintiff in ejectment to recover, it is necessary for him- to prove the defendant to be in possession of the premises or some part thereof. But in this case, although the evidence adduced on the part of the plaintiff, is stated in the record, yet there is no circumstance conducing in the slightest degree, to establish the fact of the defendants being in possession In the case of Garnett vs Garnett’s lessee, 7 Mon. 545, the Court, after.expressing their surprise that the plaintiff should have been permitted to recover; in the Circuit Court, say — “there is not *459 only a total failure of evidence conducing to show title in the lessor &c. but there is, moreover, a total lack of evidence to prove that either of the appellants were, at the commencement of the action or since, in possession of any part of the land: and no principle is better settled, than that, to enable the plaintiff in ejectment to recover, he must prove the defendant to he possessed, unless the defendant is made so for the purpose of defending the possession of some other, which appears not to have been the case with the appellants.” It certainly cannot be infered from either of these cases, that the Court deemed it absolutely necessary that it should be proved on the final trial, that the defendant was in the actual possession of the land in contest at the commencement of the suit; and it is rather to be infered from the last case, that proof of possession since the commencement of the suit, would be deemed sufficient. This inference is not contradicted by the case of Balch vs Rich.
For the purpose of obtaining a judgment against the casual ejector, and indeed, for obtaining the first orders of the Court in the action, it is necessary to show that the declaration has been served upon the tenant in possession. And hence it is properly laid down as a rule, that the declaration should be served upon the tenant in possession at the time of service. If it is not, the plaintiff may lose all the fruits of his action, as he certainly will, if no one comes in to defend. But for these preliminary purposes, the fact of proper service is sufficiently established by the return of the officer, or by other ex parte proof. For these purposes, and also for the purpose of exhibiting and preserving on the record, the formal evidence that the suit was properly instituted for the recovery of the possession, evidence of service on the person in possession is necessary. And the books of practice all require it. Yet in Tillinghast’s Adams on Ejectment, page 210, after stating that, this rule prevails where a landlord sues for his land which has been underlet by his tenant, it is said on the authority of Roe vs Wigg, 2 N. P. Rep. 330, that, ‘if the service be upon the original tenant, and he comes in and defends, he cannot aftervvards release himself from the action on the ground that his un *460 der tenants, and not himself, are in possession.” We have not had an opportunity of examining the case refered to. But on whatever ground it may have been decided, if it be evidence of the law, it seems to furnish authority for the judgment in this case.
Where a person who is entered' as a defendant has not been served with the declaration, but comes in to defend for another, it has been decided, both in this country and in England, that the plaintiff can recover only so much land as was in possession of the tenant at the time of the service upon him. The tenant himself could only have defended for that much, and whether he defends, or the landlord defends for him, the issue is the same, and the extent of recovery is the same, and the question of his possession at the time, is therefore directly in issue at the trial. It is to such a case that the doctrine to this effect laid down in Smith vs Maun, 1 Wilson, 220, expressly applies. But suppose the tenant himself, claiming the land in his own right, comes in and defends alone, and it appears on the trial, that since the service of the ejectment upon him, he has extended his possession within the boundary specially described and claimed in the declaration, and to which the plaintiff shows title, must a new suit be brought for the land to which the defendant has thus extended his possession, when all parties necessary for the litigation respecting it, are already sued? Or suppose the landlord and his tenants being in possession of different tenements, part of the same tract, held by the same title, and a declaration claiming the whole being served on the landlord and some of the tenants, the landlord defends for himself and the tenants served with the declaration; if it appear on the trial, that the tenants on whom the declaration was not served, have surrendered the possession to the landlord, must a new suit afterwards be brought against him, for so much of the land as he had not in actual possession, at the commencement of the first?
We do not know that these questions have been decided. But from the statement of the case of Myers &c. vs Sanders’ Heirs, 8 Dana, 65, which was an action for mesne profits, it would seem that the case last stated had *461 been presented in the ejectment to which the action for mesne profits refers, and that the land which had come to the possession of the landlord after he was served with the declaration, by the surrender of the tenants who were not served, was recovered. It .is not certain, however, that the facts so appeared in the ejectment, and perhaps they did not. But in deciding that the defendants in the action for mesne profits, could not avail themselves of such facts, this Court says, “they were parties to the judgment in ejectment, which taken in conjunction with their confession of lease, entry and ouster, is conclusive against them; not only of the plaintiff’s title, to the full extent of his recovery, but also as to his ouster by the defendants. And whether the facts thus excluded had been shown in the ejectment case or not, it may be certainly implied from the sentence just quoted, that the Court was of opinion that the landlord could not have obtained restitution of the land which had come to his actual possession after the commencement of the suit, and that the judgment was effectual as to such land, though it was at the commencement of the suit, in the possession of his tenants who were not served with the declaration, and not of himself, who was served. And assuming, as we may do, that there was nothing special in the consent rule, or in the verdict or judgment, in that case, this inference furnishes some authority for the conclusion, that land claimed by the declaration and in possession of the defendant at the trial, may be recovered in ejectment, though, when the declaration was served on him, it was not in his possession, but in that of his tenants, upon whom there was no service. And we see no sound objection to this, if there has in fact been a fair and full trial of the title.
In the present case, the declaration specifies the land claimed by the plaintiff, in such a manner, as that Smith and Hagan must each have known that the land he claimed to own, was a portion of that described; that each had been in possession of the portion claimed by him before the suit was commenced; and that if he was not then in the actual possession, his tenant was. Nor can it be doubted that Smith and Hagan were sued for *462 the land which they had thus had in possession, and that they were sued without uniting their tenants, either because they were supposed to be still in possession, for which supposition the sheriff’s return shows that there was some ground, or because it was supposed that, though out of possession at the time, they were the proper persons to sue for the land held by their tenants. However the plaintiff might have been mistaken in each or either of these suppositions, Smith and Hagan had each a right to defend the land which he claimed, whether it was in possession of himself or his tenant. If either was in possession, he was bound to defend the suit,, or have it done by some one for him, at the hazard of losing his possession by the default. If neither was in possession, neither was bound to defend, nor was there any reason for his doing so, except to defend the possession of the land claimed by him and held by his tenant. What then, did they mean to defend, and what did they put in issue,, when they ' severally entered into the common rule, and pleaded not guilty? Certainly, they meant to defend the possession of the land claimed by them respectively, within the boundary described in the declaration, whether that possession was held by themselves or tenants, and to put in issue the plaintiff’s right of possession of the same land. And so far as they were concerned in the suit, that land was as completely identified as the subject of the suit, and as the thing demanded of them, respectively, by the plaintiff, by proof that it was in possession, of their tenants, as it would have been by proof that it was in their own possession. And the parties did in fact, on the trial, strenuously maintain, on each side, the right of possession as to the very land claimed by Smith and Hagan, and which was in possession of their tenants.
There was then no surprise; there was nothing wanting to identify the subject of the suit and of the issue; and the tenants in possession at the commencement of the suit, having surrendered the possession to Smith and Hagan respectively, before the trial, all interest in the tenants was terminated, and the land itself, or the possession, for which the suit was instituted, was placed *463 within the reach of the judgment. Under these circumstances, we do not perceive any principle, and as already observed, we do not find any adjudged case, which requires that the plaintiff, if, after ten years litigation, she has established a right to the possession, should not have judgment therefor, against these defendants, although, when they were sued, their tenants who were not served with the declaration, were in possession. And we conclude, therefore, that the Court, having a right to assume that both Smith and Hagan had resumed the possession long before the trial, did not err, either in giving the instruction asked for by the plaintiff, or in refusing that asked for by the defendants, so far as this point was concerned.
Evidence on the part of the plaintiff.
III. Upon the trial, the plaintiff read the patent from this Commonwealth to herself, as heiress of Samuel Bell, bearing date in 1808, and issued upon a survey bearing date the 22d of February, 1783. She also proved that, in 1807, William Barnet purchased and obtained possession of the dower right of her mother in this land, from the second husband of her mother, who had resided upon it as her dower, from 1786. Samuel Bell, her father, having been killed in 1783, and her mother having died in 1815—she also proved that said William Barnet had, in June, 1811, purchased and received a deed for the entire tract from B. C. Shackleford, the plaintiff’s husband, since deceased; and introduced evidence conducing to show, that said Barnet had taken and held possession of the entire tract described in the deed, under said purchases, until he sold to others, who received and continued the possession. And she read deeds, dated in 1825, from him to the defendants, Smith and Moran, for separate parcels, describing the land conveyed as being’part of the land patented to her; and proved that Hagan had purchased another portion from Barnet shortly afterwards. The proof as to the possession of the defendants need not be again adverted to.
In making this proof, the plaintiff was permitted to read to the jury, notwithstanding the objections of the defendants — 1. the record of an action in ejectment brought by her as lessor of the plaintiff, before her marriage, *464 against J. Kennedy, &c., which was commenced in 1808, and terminated, in 1809, in a judgment in her favor, and a habere facias under which the land in contest was delivered to her, as is stated by the sheriff’s return; also, (2.) the record of an action of ejectment brought by the same Kennedy, in 1829, against James Hagan, one of the defendants in the present suit, to recover from him the same land which had been recovered from Kennedy in the previous suit; also, (3.) so much of the bill of exceptions in the said case of Kennedy vs Hagan, as states the evidence given on the trial of that case, by John Moran, one of the original defendants in this case, which last was read as evidence of the confession of said Moran, and against his heirs only, the said Moran having been originally a defendant to this suit, which, upon his death, was revived against his heirs. (4.) The plaintiff was also permitted to ask a witness whether Hagan’s counsel had not, on the trial of the case of Kennedy against him, contended, in his presence, that the line of Bell’s patent was where the plaintiff claims it to be in this suit; which was answered in the affirmative. The correctness of the several opinions of the Court by which this evidence was admitted, is brought in question by proper exceptions,
The plaintiff, before her marriage recovered some of the land in controversy, by an eject. which was managed on her partly an agent; who, after her marriage, bought the land in controversy from her husband; but tho’ she joined in the deed, it was not so authenticated as to be evidence against her; and long after her husband’s death, she sued for the land, and the deft’s, rely upon the title derived from her said agent: held that, as they claim under him by a purchase subsequent to his agency— the record of the suit manage by him is admissible, as evidence against them, upon the ground of privity, as showing their vendor's admissions and act, both as to boundary and possession, and for the purpose of showing that he acquired the possession under her title.
*464 The evidence objected to, was intended to elucidate two questions in the cause: first, to show that Barnet acquired possession of the land in contest under the plaintiff’s title, and secondly, to show that the western boundary line of her survey, includes the land claimed by Hagan and Smith, under their purchases from Barnet, both of whose tenements lie upon the western boundary of Bell’s patent; which, calls to begin at Kennedy’s south east corner, and to run north with his line. Kennedy claimed a line running due north from his south east corner. Bell claimed a line running several degrees west of north, to a corner alleged to be Kennedy’s north east corner; these two lines, with the one connecting their ends, form a triangle, which was the subject of dispute in each of the actions of ejectment, and which seems to constitute nearly one half of the land claimed by Hagan under his purchase from Barnet. The deed from Shack *465 leford to Barnet, calls for the line as claimed by Rachel Bell, now Mrs. Shackleford. The deed from Barnet to Smith calls for the same line, and describes the land conveyed as a part of Bell’s patent; but Smith’s interest in the disputed boundary is small. The sale to Hagan goes to the same line; but how it was described iii the contract does not appear. It is proved iii the cause, that Barnet was the agent of Rachel Bell in conducting, her suit against Kennedy; And as the defendants claim under Barnet, by purchases subsequent to this agency, the record of that suit would be evidence against them, as showing his admission. and acts respecting both the boundary and the possession. The record shows that the present plaintiff recovered to the line now claiihed by her, and that she was put in possession td that extent. And the possession being recovered by her, in 1809, throagh Barnet’s agency, this fact conduces to prove that Barnet, who, in 1811, took a deed for the same land from her husband, Shackleford, purporting to convey her title, acquired the possession under her title; and other evidence on the part of the plaintiff, showed the same fact. On the ground of privity, then, the record was evidence against Barnet and his alienees. Besides, it seems to be the doctrine of this Court, that reputation is admissible to prove boundary. And a fortiori an ancient judgment establishing boundary, and acquiesced in for a long time, is admissible. On this ground, both records were admissible as evidence, of boundary. And the record of the suit against Hagan, which related to his possession only, was Certainly admissible to show his own acts, and to show that he had retained the possession against Kennedy's elder patent, up to the boundary claimed by his vendor Barnet, as Bell’s patent boundary; and that he claimed to it as the line of that patent. All Of which the derivation of title to the defendants, as made out by thé plaintiff’s evidence, with the aid of the continued possession held up to the disputed line, conduce sufficiently to establish, without the aid of the records; and especially in the absence of any other title covering Hagan’s possession.
Reputation is admissible to prove an ancient boundary; and fortiori, an ancient judgt. establishing a boundary long acquisced in, is admissible. A record is admissible against a party to, (in favor of one who is not,) to show his acts; as that his possession of a tract of land, extended to a particular boundary.
The additional evidence of what Hagan’s counsel con *466 tended for in relation to the boundary, whether strictly admissible or not, goes to prove only what the record itself proves, and is of too slight a character to affect the verdict, even if it were erroneous, and particularly, as the question of original boundary is of little importance in the case.
The statements (tho’not on oath) of a deft, who died pending the suit, would be evidence against his heirs made defendants in his place; & might be proved by any witness who heard them. But query whether a bill of exceptions, reciting the evidence which he gave, as a witness in another cause, between other parties, can be read as proof of his confessions or declarations. The court seem to think not — tho’ such evidence has been held by this court, to be admissible for some purposes, and under other circumstances.
3. With regard to the admissibility of the bill of exceptions, as evidence of what Moran, one of the original parties to this suit and the ancestor of some of the present defendants, swore on the trial of the case of Kennedy vs Hagan, we have had some difficulty in coming to a satisfactory conclusion. His statements or admissions though not on oath, would doubtless be evidence against his heirs, in a contest for land descended from him. But the question is whether a bill of exceptions taken between other parties, is admissible evidence of what he stated as a witness between them. There is no doubt that his statements could be proved by a witness who heard them. And this Court has said in the case of Baylor vs Smithers’ Heirs, 1 Mon. 7, that the statement of the testimony of a witness contained in a bill of exceptions, being supposed to have undergone, not only the inspection of the parties and their counsel, but the supervision of the Court also, and being, when enrolled, a part of the record, is as much entitled to verity as the statement of a witness who heard the testimony. Taking into consideration the presumption that the statement written down by the counsel, and signed by the. Court, for grave purposes, immediately after the testimony had been detailed, is substantially correct — we are not sure that, the certainty that the bill of exceptions containing such statement, remains precisely the same as when it was first made up, might not compensate for the want of the opportunity of cross examination, which would be afforded if the former statement of a witness were to be detailed by a living witness. But if we were satisfied of this, we should still doubt whether we should, on that ground, dispense with the rule which entitles a party to the privilege of having the evidence against him verified by oath, and subjected to the test of cross examination. The case of Baylor vs Smithers decides only that the bill of ex *467 ceptions was admissible in a subsequent trial between the same parties, to impeach the testimony of the witness, by showing that he had before made a different statement. The subsequent case of Rucker vs Hamilton, 3 Dana, 36, decides that, after the death of the witness, the bill of exceptions, stating his evidence on a former trial, is admissible between the same parties, though in a different suit, as evidence of the fact formerly sworn to by the witness, provided the point in issue be the same, But there was also a witness examined as to the same fact by the party offering the bill of exceptions, and no case has decided that a bill of exceptions detailing the testimony of a witness, is of itself evidence against him, in a subsequent suit to which he is a party. And we are not at present prepared to go so far without direct authority. But for reasons which will hereafter appear, we do not think it necessary to decide this point, and without deciding it, shall proceed upon the concession, that the admission of this evidence was erroneous.
A verdict being against all the defts. authorizes the conclusion that it was not found upon evidence offered and admitted against a part of them only; and, where it thus appears that they were not prejudiced by it, its improper admission is not, ingeneral, ground for reversing a judgt. But, if such evidence had a strong bearing against all the def’ts. it may have produced a verdict against all, tho’ it was only offered against a part; and its admission will then be ground for a reversal—unless it also appears, upon the whole case, that the verdict must have been the same,if the improper evidence had been rejected,
Then, that evidence was admitted only as against Moran’s Heirs; and, as the jury have found a verdict against all, we might, in a general view of the case, be authorized to presume that the finding would have been the same, if this evidence had not been admitted, and therefore that its admission, though erroneous, was not prejudicial, and should not be a ground of reversal. On looking more closely into the case, it appears that Moran’s statement read from the bill of exceptions, contains matter of importance, having a strong bearing against all the defendants, and although it was delivered to the jury as evidence against the Morans alone, it might have opera, ted upon their minds in coming to a . conclusion on the whole case, the other defendants might not have a right to complain of this consequence, incident to a joint trial,, if the evidence were admissible against their co-defendants. But it would seem that, where it was not proper evidence as to any of the defendants, and was not only calculated to affect the verdict as to those parties against whom it was expressly admitted, but might have affected it as to the others, the mere fact that the jury have found against all the defendants, is not sufficient to show that they *468 would have done so, if this evidence had not been before them. And under such circumstances, we think that the error of improperly admitting material evidence against one, which might have affected the verdict as to all, should be deemed a sufficient ground of reversal, unless, upon the other evidence properly before the jury, it cannot be presumed that they would have found a different verdict, if this improper evidence had not been admitted. We, are led then to the evidence adduced, on the part of the defendants, and to the opinions of the, Couft in relation to it. For upon the plaintiff’s evidence, exclusive pf the statement from' the bill of exceptions, the jury must have found for her.
Points to which deft’s. evidence related.
A question of disputed boundary is unimportant in an eject, where it appears that, defts’ only possession was acquired under the plaintiff's title; for the recovery (if any) must be for the extent of the possession so acquired.
Evidence offered by defts, in support of one of their grounds of defence — consisting of a patent, sundry other title papers, and parol proof — stated in extenso; and held that the whole, was properly rejected by the ct.
*468 IV, The evidence of the defendant related — 1- to the disputed boundary; 2. to the manner in which the possession had been acquired and held by Barnet and those claiming under him; and, 3. to the delivery, by Mrs, Shackleford, after her husband’s death, of the deed made to Barnet, during her coverture, purporting to be the deed of her husband and herself, and to convey to Bar. net in fee simple all the land included in her patent.
X. The question as to the true position of the original boundary, is, really of small importance in the case, For, as the plaintiff certainly had possession of the land affected by that question, and the same was conveyed by her husband to Barnet, under whom alone the defendants claim and hold it, they cannot resist her recovery of it now, on the sole ground of a disputed boundary, if the possession was acquired by Barnet, from her husband, under her title, and if she’ has a right now to assert that title, If, then, the evidence on the part of the defendant was ever calculated to produce a doubt as to the true position of the original line, or to prove that it was not where the plaintiff claims it to have been, this alone would not have authorized a finding for the defendants as to any part of the land.. And the verdict as to the part supposed to be affected by the question of boundary, must rest on evidence which goes to the whole right asserted by the parties respectively.
2. On the last trial, as before, the defendants attempt §d to protect themselves, as to a part of the land sued for, *469 by setting up the elder patent of Hannah’s heirs, for one thousand acres, covering a large portion of the land in dispute, and by proof conducing to show that Barnet had made some contract for the purchase of that title, in 1807, and before he purchased the dower right of Bell’s widow. They read Hannah’s patent; also a copy of his will, proved in the year 1793, and certified from the Court of Charlotte county in Virginia. In which he desires his debts to be first paid, and that his executors sell, for that purpose, any part of his estate, real or personal. Bat the will was not proved or admitted to record, in any Court or of lace in this state. They also read a deed, made in September, 1811, by two of Hannah’s executors, (one of whom, however, does not appear to have qualified as such,) conveying to William and James Barnet, the land contained in Hannah’s patent, without warranty, except against themselves. This deed recites that, in 1807, Richard Graines, a third executor, together with William Henry, as agent of Brent’s heirs, who, as the deed states, were entitled to one half of the land under Hannah, had, for the consideration of $533 32, sold and conveyed the land to James and William Barnet, who claimed lands with which this patent interfered; and the additional consideration of one dollar is acknowledged. But the alleged deed of 1807, was not produced, nor was there any other direct proof of its existence or contents, than that contained in the above recital, which was not evidence against the plaintiff. Three witnesses speak of the purchase of Hannah’s claim by William Barnet, in 1780; all say it was before his purchase of the dower right. All say he took and held possession under his.purchase of Hannah’s claim, ’ Two of them, however, show that the possession of which they speak, was taken of the' dower land, and acquired from the dowress or her tenants.
Upon a motion to reject or exclude evidence, it is the province of the court to decide all the facts upon which its admissibility depends.
A recital in a conveyance that a previous deed for the same land had been made to the same grantee, is not evidence against an adversary claimant.
Where there are 3 executors named in a will, which directs them to sell the testator’s real estate, and two of them have qualified, one alone has no authority over the title— which is in the heirs; and no contract, with respect to the land-made with 1 only can confer either title, interest or authority.
Nor can a deed so made (by one of three ex’ors,) derive any aid as evidence of title or right of possession, from the fact that another grantor unites in it, who styles himself agent for other part owners, where there is no proof of his authority, or their title.
Neither of these two witnesses says he had personal knowledge of the contract by which Barnet had purchased Hannah’s claim; one of them says he heard it stated by the parties soon after. And that a horse was paid at $100, which is the only payment proved. Neither of the two states any act of taking possession by Barpet, outside of the dower claim. Nor does any one *470 of the three pretend to know the terms or manner of his acquiring possession within it; or that such possession was acquired before he bought the dower. But the third witness, Moran, one of the defendants, states that, in 1807, before Barnet purchased the dower interest, and after he had made the contract with Gaines and Henry, (which he says was in his presence,) he, Barnet, entered upon the land outside of the dower lines, and cleared a turnip patch, claiming to the full extent of Hannah’s boundary; that the turnip patch was [enlarged the next year, and held afterwards, in possession by Barnet and others under him, and that he and his alienees claimed under Hannah; and he fixes the place of this entry and actual possession — of which no other witness speaks — in the triangle before mentioned as being formed by the two lines from Kennedy’s south east corner; which triangle, as appears by other evidence before referred to, and the possession thereof delivered to the plaintiff, in 1809, by means of the judgment in ejectment obtained for her through the agency of William Barnet,; and of which triangle, a small part is embraced in the deed of Barnet to the defendant Smith, describing the land conveyed as apart of Bell’s survey, making no reference whatever to the elder patent of Hannah, which covers the whole of Smith’s land, and calling for the western boundary, as claimed by the plaintiff; while the residue of said triangle, of which a part only is covered by Hannah, was afterwards sold by executory contract to Hagan; who claims and holds up to the same boundary. The deed to Moran, also, refers to Bell’s patent, but makes no reference to that of Hannah’s heirs.
Tho’ a deed by 2 of 3 ex’ors, to whom a peremptory power to sell the land of the testator is given by the will, may pass the title, or may ratify a prior insufficient conveyance by one of the ex’ors, it cannot retro act so as to give to any entry or act of the grantee, any greater effect or extent than it had at the time of the entry or act.
A will which is neither recorded in this State, nor proved on the trial, is not evidence of a title to land in this State.
Defendants claim that, a party under whom they hold, acquired possession of the land in 1807, by having then entered and made a turnip patch upon it; but it appears that he was then without title, and that afterwards he man aged a suit for pltf. in which she recovered the land, (including the turnip patch) and obtained the possession under a ha. fa. in 1808-9: that was an abandonment of any possession that he may have had, and precludes the claim to a continued possession commencing at an earlier date.
Upon the evidence of the defendants, relating to Hannah’s claim, the plaintiff’s counsel moved the Court as follows:—
“ To exclude the whole testimony of the witness, Moran. To exclude so much of it as relates to Hannah’s claim, or a contract for the purchase thereof by William Barnet. To exclude Hannah’s patent — Hannah’s will, and deed from-to William Barnet. To exclude all the testimony in relation to the claim of Hannah, and *471 the purchase of that claim by Barnet which last motion the Court granted.
If this evidence was properly excluded, the jury were bound to find for the plaintiff, unless she had parted with her title; because no other title would have appeared, but that of the plaintiff; and the uncontradicted inference from the documentary and other evidence, exclusive of the statement of John Moran’s testimony from the bill of exceptions, would have shown, that the possession had been taken and held under her title.
Taking the real question arising on this testimony, and on its admission or exclusion, to be whether it showed that the defendants were in such a condition with regard to the possession, as to authorize them, to use Hannah’s elder patent as evidence against the plaintiff — the enquiry would be, whether, by the preliminary testimony, or such of it as was competent in its character, it appeared that Barnet, from whom the defendants acquired the possession, had himself acquired and held it under the patent of Hannah, and not under the plaintiff’s claim.
Upon all the evidence introduced by the defendants, on this subject — waiving any separate objection to any specific portion of it — we should certainly be of opinion that, taking it without reference to the plaintiff’s evidence, it conduced to show an entry and possession, in 1807, to some extent, claiming under Hannah, outside of the dower land at least, although it did not conduce to show any real interest or title in Hannah’s claim, in 1807. But on comparing it with the plaintiff’s evidence of the early and long continued possession by her mother, and especially, with the agency of Barnet in the ejectment against Kennedy, in 1808 and ’9; with his purchase from Shackleford, in June, 1811, at the price of five thousand dollars, and with his deeds subsequently made to two of the defendants, and which are evidence against all, we should have no difficulty in coming to the conclusion, that, whatever he may have done in 1807, outside of the dower line, he certainly acquired the possession within them, under the plaintiff’s title; and that, as to the lands, outside of the dower lines, he neither had, nor supposed himself to have, any substantial claim, or even *472 possession, adverse to Bell’s title, when he purchased from Shackleford. The consequence of which conclusion would be, that if, under the rule laid down in Hamilton vs Taylor, Litt. Sel. Ca. 445, it was the province of the Court to decide the facts on which the admissibility of the patent depended—the preliminary evidence being insufficient to show the right to set up the patent, the Whole evidence was properly excluded.
But waiving the application of this rule, if the will of Hannah had been proved and recorded in this State, of proved on the trial, so as to make it competent evidence of title to land in this State, (Sneed vs Ewing and wife, 5 J. J. Marsh. 466;) and, if the power therein given to the executor to sell land, should be deemed peremptory, and not discretionary, which is, to say the least, extremely doubtful; still, as there were three executors of whom’ two at least qualified, one of them alone had no authority over the title' which was vested in the heirs; and the contract which he made with Barnet, whatever may have been its character, (arid it is not even proved to have been written,) conferred neither title nor interest, nor authority ; and there being no proof as to Henry, either of his own agency, or of the interest of his alleged principals, his being a party to the contract did not give to it arty greater effect, Whatever entry or claim Barnet may have made under this contract, was no more effectual than' if there had been no such contract, and could have divested no possession beyond his actual occupancy. And, if the deed of 1811 from the other two executors, be considered as passing the title, and as ratifying the previous act of their co-executor, still it could not so retroact as to give to any entry or act of Barnet, as against other parties, any greater effect or extent by relation, than it had at the very time of such entry or act. But the will of Hannah not having been recorded in this State, nor proved on. the trial, was not evidence of title to land in this State, Sneed vs Ewing, supra; and might therefore have been properly excluded on the ground of incompetency. And then the deed from the self-styled executors of Hannah, was itself ineffectual to pass title, or to ratify the previous sale therein refered to; and being made after the *473 deed from Shackleford to Barnet, could have no bearing 'or influence on the case, and might also have been properly excluded. And there being no evidence of even the ’shadow of authority or interest in Gaines, any more than in Henry, there could have been no acquisition of title, or interest or authority, from them; And even if the testimony of the defendant Moran ought not; after he had been permitted to testify Without objection, to have been excluded, on the ground of his being a party, the case, as made Out by the defendant’s proof, would be (and it is in fact no more if the will and deed be also taken into view,) that Barnet, claiming to have purchased Hannah’s title, cleared a turnip patch, in 1807, within Bell’s patent, outside of the dower, and in doing so, claimed to the extent of Hannah’s patent that, afterwards, he purchased out the dower interest, .and got possession of the dower land, from the dowress and' her tenants, and that the next year, he extended the clearing at the turnip patch, and, as the witness says, he continued to hold and claim under Hannah. But he had no real claim under Hannah’s patent, and his own acts and solemn deeds testify that whatever he might have done with regard to the land outside of the dower lines, in 1807, he purchased Bell’s title from Shackleford, in June, 1811, as the real title on which he relied, and from thenceforth claimed under that title; and his agency in the ejectment of 1808-9, and the record of that suit, show that the turnip patch; the only indicium of his possession and claim under Hannah’s title, was abandoned by him, and delivered to the plaintiff. And if it could be presumed that the possession of the dowress was not co-extensive with the boundaries of Bell’s patent, (for although some of the witnesses speak of the dower lines, it is expressly stated in the bill of exceptions, that there was no evidence of any allotment of dower;) and if it should also be presumed, that the plaintiff herself, being of age, had taken no possession outside of the dower lines, until her recovery in 1809, the possession then taken, gave her possession to the extent of her boundary; and especially, to the extent of the triangle actually delivered, notwithstanding the occupancy of the turnip patch under her agent, if he did then occupy it, and her agent canned *474 gainsay this effect of it, by proof thirty years afterwards, that he had cleared a turnip patch, and continued to hold it, claiming under another title, in which he had no interest. But Barnet had no personal occupancy of this spot in 1809; and there is no proof conducing to show that he then took or had any distinct possession outside of the dower lines, after Rachel Bell thus became invested with the possession, until he received it under the deed from her husband, Shackleford, And as to the dower land itself, there is not a question upon the evidence, that he acquired the possession under the dower claim, and from the dowress and her husband, or their tenants.
It is, moreover, evident from a comparison of the consideration of the purchase of the plaintiff’s title with that of the alleged purchase of Hannah’s title, and from the recitals in the deed from the two executors, that the latter purchase was made for the purpose of quieting a title. And, as it does not appear that, in 1807, Barnet had any land with which Hannah’s patent interfered, except his interest in the dower claim under the plaintiff’s title, the recital that he had such lands, apparently as a motive for the sale or purchase of Hannah’s title, in 1807, furnishes ground for the inference that his purchase from Gaines and Henry, was in fact subsequent to his purchase of the dower interest. And this inference can scarcely be considered as being shaken by the loose statements of the witnesses, made' more than thirty years afterwards, when none of them protended to fix, or to know, the date of either purchase, or to refer to any circumstance which enables them to fix the order of precedency between them. This consideration, however, is merely corroborative, and is not essential to the conclusion, that Barnet acquired the possession of the dower interest by his purchase of that interest, and so held it until his purchase from Shackle, ford, and that he acquired the possession outside of the dower interest, under and by virtue of that purchase ; and that, although he may have made occasional references to Hannah’s title, he never, while in possession, claimed adversely to that of the plaintiff; but continued to hold and claim under her title. And, in our view of the evidence, there is no circumstance in the case, which conduces to *475 destroy these conclusions, or would justify a jury in finding in opposition to them.
Conveyance, by a deed of bargain and sale, purporting to be by husband and wife, of land which she inherited from her father, but not so authenticated as to be evidence of a transfer of her title, & therefore, operating only as the sole deed of the husband: held (in her action, bro't many years after his death, to recover the land, that his alienees cannot be considered as holding adversely as holding adversely to her, nor be permitted to set up, against her, the elder patent of her father. For-
Tho' a conveyance by feoffment fine and recovery, was deemed capable of creating a fee simple in the feof fee, tho's feofor had no such estate-a conveyance by bargain and sale never did produce a discontince, vest the grantee with any greater estate than the grantor had; it only puts the one in the place of the other, as to the title; hence, if lessee for a term conveys to a stranger, in fee, the grantee takes only the term subject to his grantor’s obligations to his landlord. So—
Where a husband conveys his wife’s land, and survives her, he can set up no adversary title against his heirs; neither can his vendee. But 20 years possession, openly adverse to the title-holder, might bar his entry.
There was, therefore, no error in rejecting the whole of this evidence, including Hannah’s patent: unless it be true, as contended for by the defendants, that so far as Barnet acquired possession under the deed from Shade, ford, purporting to convey the plaintiff’s title, he is to be considered as holding adversely to the plaintiff, or at least, has a right to set up against her the elder patent of Bell. And our attention has been particularly invited to this proposition, and to the case of Detheridge vs Woodruff, 3 Mon. 244, and the same case in 6 J. J. Mar. 368, in the first of which it is decided to be the law, and approved in the other, though not essential to the case as there presented. The opposite doctrine was, however, asserted by us, in the case of Miller vs Shackleford, 4 Dana, 264; and has been impliedly assumed in what has already been decided; because upon a reconsideration of it, we do not see any sufficient ground for changing our Opinion.
In addition to the reasoning and authority by which this opinion is supported in the case last referred to, we will now remark that, the opinion of the Court in 3 Monroe, 244, seems to have been founded exclusively on the doctrines applicable to the common law conveyances by feoffment, fine and recovery; which, operating by a transfer of the land itself, were deemed capable of creating a fee simple in the feoffee, though the feoffor had no such estate. It is to this species of conveyance that the doctrine of discontinuance applied. A conveyance by bargain and sale, thought it purport topass the never produce a discontinuance, nor create, by its own force, a greater estate in the grantee, than the grantor himself had. But operating to pass such right only as the grantor has, it only substitutes the grantee in the place of the grantor, as to the title. Hence, though a lessee convey to a stranger by bargain and sale, in fee, and deliver possession to him, the grantee, though claiming a fee, is *476 subject to the obligations of the lessee, so far as regards the title of the landlord, as decided in Phillips vs Rothwell, 4 Bibb, 33. And, as Shackleford, supposing him to have survived his wife, (there having been no child born during the marriage,) could not have set up an adversary title against her heir, nor have resisted a recovery by him, of land of which he had acquired possession by the marriage, go Shackleford’s alienee is under the same restriction. 4 Dana, 288. If the possession be taken and held under the title of another, it cannot be released by accompanying the transfer of it to another, with a deed. And although twenty years possession openly adverse to the title holder, who has the right of entry, and is under no disability, may bar his claim, there is no ground for the application of that principle in this case. There was no possession with open hostility to Bell’s title ; no right of entry without disability, and no twenty years. And even if Barnet while in possession claimed under both titles, that does not authorize him to set up the statute of limitations against the plaintiff; and as he acquired possession under her title, he or his alienees must restore it to her, before they can set up another against her, within twenty years after her right of entry accrued. Nor is there .any room for the presumption, if it would be available in this case, that Barnet had a perfect conveyance of Hannah’s title in 1807. The facts repel such a presumption. And although Hannah’s was the best title, yet as Barnet, when he got possession of the dower interest, had no real claim to that title, and as the possession under Bell’s claim, though there was no patent, had been held for more than twenty years, without the slightest interruption, there is no ground for applying to the fact and manner of his taking or holding the possession, the presumptions which are claimed in analogy to what is said in regard to the Mayberry tenement, in the case of Chiles vs Jones, 7 Dana, 528.
A deed purporting to be the deed of husband and wife, but void as to her, for want of authentication, might be confirmed, and made effectual as to her, by a rede livery after her husband’s death, —provided, she was aware of the defect, and that redelivery alone would render it effectual, and did redeliver it, -with that intent. But proof that she knew that the deed was invalid, and that she had said that, she had confirmed the deed’— (without any evidence that she knew that a redelivery was the only mode in which it could be confirmed,) would not authorize a jury to infer that she ha in fact redelivered it—and was properly rejected.
*476 We conclude, therefore, that there was no error in excluding the evidence under consideration, and that the jury was bound to find for the plaintiff unless 3. she had with her title which the defendants attempted to show that she had done, by redelivering after the death of her husband, the deed which has been spoken of as *477 the deed of Shackleford to Barnet, but which purported to be the deed of herself, as well as of her husband, but was void as to her, for want of proper evidence of her having consented to pass her inheritance. 3 Dana, 289; 4 Dana, 264; 5 Dana, 232.
The evidence upon that subject, as now presented, differs from that heretofore presented- in only two particulars which need be noticed. 1. It now appears that Mrs. Shackleford, in speaking about the deed, said she had confirmed it. The evidence before, was that she either said that ‘she had confirmed it’ or that ‘she then confirmed it;’ and, 2. it is now proved, for the first time, that she knew of the defect in the deed soon after her husband’s death, and probably before the conversation in which she said she had confirmed it. The other evidence on this point, is substantially stated in the special verdict in the case of Miller vs Shackleford, 4 Dana, 264, and also in the former opinion in that case, 5 Dana, 232.
The Circuit Court rejected the whole of this testimony; and it is now contended that, under the opinion heretofore delivered in this case, the proof upon the last trial, conduced to prove a re-delivery of the deed, and should have been left to the jury. After the repeated discussions which this subject has undergone in the cases growing out of this deed, we deem it necessary only to say that, if the opinion referred to, is to be understood as laying down the circumstances under which the declaration of Mrs. Shackleford that, ‘she had confirmed the deed,’ would conduce to prove that she had re-delivered it — the proof in this case does not supply those circumstances. Her knowledge of the defect in the deed was one of the circumstances deemed indispensable; but it was also required that she should have known that a re-delivery was necessary to make it good; and it was only said, even with these circumstances, that, if the declaration that she had confirmed the deed, was deliberately and understandingly made, it be understood as indicating, and therefore as conducing to prove a re-delivery. Omitting other remarks, it is sufficient to say, that, in this case, there was ho proof that she knew that a re-delivery was necessary to make the deed good, and therefore, no sufficient ground, *478 for presuming that, in saying she had confirmed the deed, she ment that she had re-delivered it.
There was no error, therefore, in excluding this testimony, and there being no evidence before the jury, conducing to prove, either that the plaintiff had parted with her title, or that there was any other title better than hers which the defendant could set up, there was no ground for any of the instruction asked for by the defendants on these subjects, and no error in refusing them, however correct some of them may have been, as abstract propositions. And the jury were bound to find for the plaintiff, upon the evidence before them, exclusive of the bill of exceptions stating Moran’s testimony on the trial between Kennedy and Hagan.
Wherefore the judgment is affirmed.